The final orally argued case, Camolli v. Huntington Learning Centers. Good afternoon, your honors. May it please the court. I'm Rhett Millsaps for appellants Dena Ann Camolli, Christine Holliday, and Sandra Williams. There are two issues on this appeal, one pertaining to Ms. Williams and one pertaining to Ms. Holliday. The district court erred on both issues by improperly usurping the role of the jury and deciding disputed issues of fact on summary judgment in Huntington's favor. I'll address Ms. Camolli and Ms. Williams' claim first and then turn to Ms. Holliday. In regard to Ms. Camolli and Ms. Williams, the issue on this appeal is whether the evidence in the record creates a genuine issue of disputed fact as to whether Ms. Camolli and Ms. Williams gave their written consent to Huntington to broadcast the commercial in which they appear in perpetuity. Section 51 of New York's civil rights law provides an absolute right to injunctive relief, as well as damages, when someone's likeness is used for advertising or trade purposes. We have the same document that appears on A231, but Ms. Williams had written her name in cursive script. Would there be an issue of fact on this record as to whether there was a written release? Exactly the same document, but instead of printing her name, she wrote it in Palmer Method cursive script. Right where it is. Very truly yours, Sandra Williams, only it was in script. Well, the issue here, Your Honor, is not whether it's written in script or not, because New York law is clear that any mark can constitute a signature. So even if she signed it in script, you would say there's an issue of fact? If she had signed it in script here, we probably would not claim that there was an issue of fact. So then what is the difference, given that, as you just said, that's not the issue, because New York state law says something in print can be a signature, as well as any other thing that somebody adopts as a signature? Judge Lynch, what's clear under New York law is that the intent of the person making the mark is what's most important. So even if she signed it in cursive script, you would have the same argument? She would come in and say, I didn't mean to give my permission? We would not, and that's not what happened here, Your Honor. Why not? I'm trying to understand. Either the critical fact is it's not in cursive script, or that's not the critical fact. The critical fact here is the intent, and whether there's objective evidence to back up Ms. Camolli and Ms. Williams' testimony that they did not intend to execute or sign these documents by printing their name. But it's right under Very Truly Yours. Correct, Your Honor. What does that usually mean? Well, there's, first of all— If you signed something under Very Truly Yours, what does that mean? What are you doing? In a letter, that would be—that's typically where a signature goes. There's an element of common sense here that people expect when they sign a document, you know, or execute a document, that there will be a signature line on which they place their actual signature. For instance, if I went to the bank and filled out a loan application, I can print my name, address, and phone number on it. But if I don't sign it on the signature line, the bank's going to return it to me and ask me— If you print your name on the signature line and you intend that to be your signature, then that would be acceptable. But if you print your name on the signature line and give it back to the bank and the bank accepts that as a loan application, are you suggesting that I would have an issue of fact that I never really applied for the loan because I didn't sign it in script? I'm not suggesting that, Judge Lynch. I'm still having trouble understanding why, if we have a document that is quite clear as it's the kind of release that actors sign when the advertising agency or whoever is trying to comply with the law, and you write your name in print, in cursive, in Arabic, in Bengali on that line, whatever script you use, why is there any issue of—can you create an issue of fact just by saying, I didn't mean it? No, Your Honor. There needs to be objective evidence in the record, and there is here. There are 31 releases that Huntington produced in which—that are properly executed. Those are on a—let's see. Those are A196 to 226, and those 31 releases, including a release for Ms. Holliday, the actors printed their name, address, and phone number and they signed on the signature line at the bottom. That's why Ms. Holliday is not claiming here. That's why her claim is different from Ms. Camolli and Ms. Williams at this point. So when you look at the two, there's a clear difference between the two here. You also have—you have Ms. Camolli and Ms. Williams' testimony that they have never signed a document by printing their name, address, and phone number. This is not their signature, and that they've never seen or heard of a release that did not require an actor to sign the release on a signature line at the bottom. What did they intend? Is their testimony to what they did intend by writing their names here? Their testimony is that they don't remember seeing this release, but what Ms. Williams testified—they all testified that the set was chaotic that day, that they were being rushed to get on the set and into hair and makeup. And what Ms. Williams surmised is someone put some paperwork in front of them and said, you know, please fill out this paperwork with your name and contact information, and you can, you know, read it and sign it and revisit it. It's all conjecture. Afterwards. It's all conjecture, what happened. Yes, Your Honor, that is conjecture. Now, if you—my understanding is that where the actor was under the age of 21, only the parent or guardian signed the signature line. That is what Huntington contends, and the signature line, if you read under it, says if signatory is under 21, the parent or guardian must also sign above to signify agreement. But doesn't that undermine your interpretation of— Your Honor, we concede that this language is ambiguous, but plaintiffs maintain that a reasonable interpretation of this language is that the parent or guardian has to sign in addition to— So are all these parents and guardians in error by not having the minors sign the signature line? Well, no, because under the law, what matters is that the parent or guardian ultimately signs. We contend that this language indicates that it's very important that the parent or guardian, in fact, essential that they sign this document, but this language doesn't indicate that the adult actors don't have to sign it. And in fact, again, there are 31 releases provided by Huntington that do have adult actors signing on the line, including Ms. Holliday, including Andy Zhu, for whom we provided an affidavit was an adult at the time, including Ann Julian, who Huntington's 36th witness conceded was an adult and signed on this line. Furthermore, there's evidence— What do we make of the fact that the plaintiffs, your clients, participated in the commercial, right, and they cashed $500 checks as compensation? Yes, Your Honor. The law is clear that participation in the commercial, including the law of the circuit, is clear that making a recording does not equal giving consent to release that recording publicly. And the checks that were cashed in this case, none of the checks reference a usage period. I see that I'm over time, but I'll answer the question, obviously. The checks, none of them reference a usage period. And the plaintiffs all contend that they believed that the usage would be for a short term because of the amount that they were paid here and that the $500— And so they thought it was a release for a limited purpose. Doesn't that mean they still know it's a release or they're still signing it as a release? In other words, they—I understand, and I indeed had a trial once based on a case where summary judgment was awarded for the plaintiffs of people who appeared in a commercial, knew they were appearing in a commercial, and did not sign anything because you need to have a written release. But here, they knew they were going to be in a commercial. This was not a casual sort of event. There was paperwork given to them. I'm just puzzled as to what they could possibly have thought they were doing. And it sounds to me like you just said they thought they were signing a release for a limited release of the commercial, not for in perpetuity. Your Honor, on a set, it's typically my experience that actors are not concerned as much with the paperwork as they are their performances. And it's undisputed in this case that the set was chaotic that morning and the plaintiffs were being rushed around to hair and makeup and to get to set and to perform their roles. They don't remember seeing or signing any paperwork. But they do contend that they never would have signed a perpetual release. I never would have signed a perpetual release says if only I had read this document, I would have refused to sign. That doesn't say I didn't sign something that I didn't realize was a perpetual release. Correct, Your Honor. Your Honor, the plaintiffs, Kamoly and Williams, contended that when they saw these releases, it confirmed what they had said all along, which is that they never signed a release that allowed Huntington to use the commercial for this period of time at all. They didn't remember whether they had signed a release is the truth of it. They didn't remember whether they signed a release. Is there any testimony about their experience or background? Are these people who never previously had ever signed releases or been appeared in commercials of this kind? No, Your Honor. These actresses have all appeared in other commercials, and they testified that they have never seen or heard of a release that doesn't have a signature line at the bottom that requires a signature. But this was a nonunion commercial, and they have typical experience with nonunion commercials of this type. And they testified that for $500, typically it's for a short period of time in a short area. Indeed. Yes. That's the issue, isn't it, that they didn't know what they were signing away? No, Your Honor. We submit that the issue is that they did not have an intention by printing their name, address, and phone number to sign the release. It says personal release at the top. Correct, Your Honor. It says personal release at the top. It's possible that this was put in front of them along with other paperwork, and the P.A. on the set, the production assistant, said, you know, we need to get you into hair and makeup and do your thing. Can you just fill out the information with your name and contact information? And then afterwards, you know, we'll deal with the signing and the reading and all of that. And then they just never got around to that. That's possible. And the point here is that there is objective evidence in the record, including Huntington's 30B6 witness's own testimony, that a fully executed release, she agreed with this, included the actor's name and contact information filled out as well as the actor's signature. Thank you. You'll have two minutes to rebuttal. May it please the Court. King Poore for the Huntington defendants. We've now heard two important concessions or admissions from counsel for the plaintiffs. One, that if Ms. Williams had signed her name in cursive, and presumably also Ms. Camolli, whose signature is really in the nature of a quasi-cursive signature, they would have no claim on their behalf. And two, I think that we're all in agreement now that under New York law, a signature does not have to be in cursive. It may be a mark. It may be printed. So what we're left with here is simply allegations that even though they admit that this is their printed name on the release, that it's not their subjective intent that they be bound by it. You rely quite a lot on Section 46 of the general construction law, and that section makes clear that a printed name can constitute a signature, but only if the printing is made, and here's the language, with intent to execute the relevant writing. So why isn't the relevant question, as the appellants suggest, whether the plaintiffs intended to execute the contract? Because under New York law, as everywhere, the signing of a release or any contract with a valid signature, and I think we're at the point now that there's no question that this is a valid signature. If it's a valid signature, then it is presumed to be conclusively binding unless there is some other reason. That is, there was fraud or there was duress, which has never been alleged here, and all we have are a litany of excuses which the law has always found are not sufficient to overcome that presumption of being bound, such as we don't remember reading the contract. That's never been a reason. We were hurried on the day of the shoot. That's never been a reason to say that you're not bound by a contract because you didn't read it or read it more thoroughly, or that there were other... They claim they never give rights in perpetuity. That's what they say, that they ordinarily don't sign away these rights forever. They may have that intent. I don't know if that's subjective so much as trade usage. This is the way it works in this industry. You sign up for a limited period, although the release doesn't talk about limited periods, but they would never have signed up to give away their rights in perpetuity. Well, Your Honor, that may be their intent three years after they signed the contract, but the contract is as plain as it can be. It says permission is given in perpetuity throughout the world. Now, there's no limitation, and it also states there's no other expectation of compensation. That's as clear as it can be. You're saying there's a difference between intending to sign a release and intending to agree to the terms that are written in the release, right? In other words, if you actually sign a contract without reading it, then you're kind of stuck. This isn't even a contract, by the way. This is just, under New York law, a permission. It can be unilateral. It doesn't require consideration, et cetera, et cetera. So if you signed it without reading it, it seems to me you are kind of stuck. But most of the time, the appellant seems to be arguing that there was no intent to sign this at all. There was just an intention to give their contact information, and therefore the printed name is not intended to serve as a signature. Do you have any response to that, or what is your response to that? As to that, Your Honor, we've already got the admission that had they signed it in cursive, then that's their admission, that had they signed it in cursive, that would have been permission. It looks like Ms. Camolli did sign it. And she signed it in something you might call kind of quasi-cursive. And Ms. Holliday did sign it. So we're back to the argument that had we only signed it in cursive, that would have been valid permission. And that brings us back to Section 46 again, that it doesn't have to be in cursive. It can be printed. It can be any mark. So we keep coming back to that. And if they've admitted that had it only been in cursive, we wouldn't be here, then it stands to reason that we only need to go back to Section 46. And as a matter of logic, that's a valid signature. All three are valid signatures. Ms. Holliday's in cursive, the semi-cursive of Ms. Camolli, and the printed. It doesn't matter. So what we're left with again is plaintiffs who say, we admit this is our handwriting. These are valid signatures. And after the fact, we're claiming that it wasn't our intent because either, A, we don't remember, or, B, we were hurried, or there were other people who signed these on behalf of children in cursive, or there is a corporate representative who says that the signature is complete. None of that. But so the signature line states that the parent or guardian must also sign, not that only a parent or guardian should sign. So isn't it reasonable that the plaintiffs here could have thought that they weren't executing the release? Not at all, Your Honor, because that signature line at the bottom states expressly, if the signatory, and here again, there's the word that this contemplates a signature, if the signatory is under 21, requires the signature of the parent. That just says you have the child actor, and then they want permission from the parent as well. It doesn't mean that an adult who signs this is not bound. But if the interpretation isn't reasonable, then what accounts for the fact that many of the adult actors, including Ms. Holliday, signed the signature line? Well, that's, again, the fact that someone who signed it on behalf of a child actor, or someone may have thought, well, maybe I'll just sign it here, that doesn't undercut the idea that when you sign this release, either in cursive, semi-cursive, or printing, you are still showing your assent. And that's what this is all about. It's about assent. It's about to, is there an indication that you intended, you gave objective evidence. And there is no more basic objective evidence of assent than a signature. Contract law is built on that basic idea that parties cannot sign contracts, and then years later say, you know what, even though I did sign it or I did print my name there, you know, I really didn't mean to give consent because I don't remember it, or I was too hurried, or other people may have signed it in a different way, or the releases were in some other location for a long time. All these, none of them add up to anything that would be objective evidence. And that's the essence of what the district court found here, is that when you add all this up, it's all one after another subjective allegation as to what their subjective intent is. And contract law or even assent cannot really continue as we know it if all of these, if the idea behind a written signature, whether it's printed or a mark or whatever, doesn't mean anything because the signatory can come back at some later date and say, I really didn't intend this to be my consent. So for those reasons, we ask that the district court's opinion and its ruling be affirmed, unless the court has any further questions. Thank you. Thank you. Your Honors, the problem with Huntington's argument here, as you pointed out in your questioning, is that they don't have an answer here to objective evidence on intent. And all of the objective evidence in the record supports Ms. Camolli and Ms. Williams' argument that they didn't intend to sign it by printing their names and filling out their information. To speak to Judge Pooler's question about industry standards, there's also appellant's expert's testimony, which is unrebutted and uncontradicted, that it's an industry standard to have an actor sign a release on a signature line, and that's uncontradicted by Huntington. The complaint in this case is not in the appendix, I don't think. Would I be correct in speculating that the complaint said there were no releases? The complaint said that plaintiffs did not remember signing any releases, but that they would not have signed releases. And then for a long time there were no releases, and the case was litigated on that basis until the releases were discovered. Correct, Your Honor, and that happened in two parts. First, Huntington discovered 31 releases, all with signatures on the signature line, and they turned those over. Then, because they still hadn't found releases for Ms. Kamolli and Ms. Williams, they went back to the production company involved and said, please search urgently, and the production company came back with the releases without signatures on the signature line. Which might be very problematic, except that everyone acknowledges that these are, in fact, not concocted after the fact, but are, in fact, the handwriting of the plaintiffs. So all I'm getting at is this whole argument is really not how the case started out, right? Now we're still trying to save the case, even though they did, in fact, execute these releases. No, Your Honor, the plaintiffs actually sent e-mails, which are in the record, saying we don't believe we signed anything in 2014 before this case ever even started. Yeah, of course, they didn't remember it. I'm not saying they were dishonest. They didn't remember it. They didn't think they signed any releases. And so we had sort of what looked to be a no-release case. But then it turns out they executed these releases, and now we've got a kind of fallback argument. But, Judge Lynch, as you pointed out, Huntington did not produce the releases for Ms. Kamolli or Ms. Williams until the end of discovery on the day, and we contend that's additional objective evidence that whoever kept these releases knew that there was a qualitative difference between the two because they didn't produce them all at the same time. You're saying you're inferring that they actually knew they had releases, but they were worried about them, so they would rather have litigated the case without the releases in them? No, Your Honor. They deliberately withheld them, and that shows that they didn't think these were real releases? No, Your Honor. We're saying that the person who kept these releases, the production assistant, kept them in separate piles and boxes because the production assistant realized at the time, oops, I probably screwed this up. I didn't get signatures on these releases. And that's why initially the production assistant did not turn over those releases when Huntington first asked and withheld them. But there are three cases under New York law, Your Honor, that we cite which are very on point here that Huntington has no response to in their opposition. Those are Jafari v. Wally Finley Galleries in the Southern District of New York. There the court denied summary judgment because there was a document, a bill of sale, that was in the defendant's handwriting, and the defendant had initialed the price of the document, and the court denied summary judgment saying there was a question of fact as to whether or not there was an intent for the defendant to sign off in that case on the agreement. There was also S.D. Protection Inc. v. Del Rio in the Eastern District of New York where an employer emailed an employment agreement to the employee. The employee never signed on the signature line at the bottom but sent back an email saying your offer is accepted, and the court there found there was an issue of fact that necessitated denying summary judgment and said explicitly that an unsigned signature line at the bottom was enough evidence to create such a triable issue of fact. And then finally there's Molina v. Phoenix Sound from the First Department in 2002 involving a model release in which the defendant offered evidence that the model had been paid $200, that a stub had been made out saying $200 for your services here, that the model had signed this with her signature, and the court found there was an issue of fact that precluded summary judgment because it was for the jury to decide whether or not that constituted written consent from the model. So it's inappropriate here for the court to decide as a matter of law under the circumstances of this case that the appellant signed these documents when there's a blank signature line at the bottom on which they didn't sign, when 31 other releases show that the actor signed on that, including adult actors. It's inappropriate that the district court drew the inference in Huntington's favor that the language under the signature line meant that only parents must sign on the line. That inference, as I believe Chief Judge Katzman pointed out, you could equally draw the inference that because it says must also sign, it means that both parties should sign, or at least that the actor doesn't say that an adult actor doesn't need to sign on this line. For all of these reasons, including Huntington's 30b-6 witness's own testimony, appellant's unrebutted expert testimony that's not addressed at all in Huntington's opposition brief to this, all of these pieces of evidence add up to show that there is an issue of fact that the jury should decide whether or not Ms. Camulli and Ms. Huntington printing their names and address on the form constitute their signature, and a jury could decide this purely on the basis of common sense and the bake loan. Thank you for your argument. Thank you very much. The court will reserve decision. The remaining cases are on submission. The clerk will adjourn court.